NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
ASCH WEBHOSTING, INC.,          :
                                :   CIVIL ACTION NO. 04-2593 (MLC)
        Plaintiff,              :
                                :   MEMORANDUM OPINION
    v.                          :
                                :
ADELPHIA BUSINESS SOLUTIONS     :
INVESTMENT, LLC,                :
                                :
        Defendant.              :
_____:
```

COOPER, District Judge

The defendant, Adelphia Business Solutions Investment, LLC, d/b/a TelCove ("TelCove"), moves to impose sanctions against the plaintiff, Asch Webhosting, Inc., d/b/a 1104net.com ("Asch"), and its counsel, Archer & Greiner, P.C. ("Archer & Greiner").  For the reasons stated herein, the Court will (1) deny with prejudice the part of the motion seeking to impose sanctions pursuant to the Court's inherent power, and (2) deny without prejudice the part of the motion seeking to impose sanctions pursuant to Federal Rule of Civil Procedure ("Rule") 11.

## BACKGROUND

Asch entered into a three-year Internet service agreement ("the Agreement") with TelCove in December 2003.  (Compl., at 3.) The Agreement provided that TelCove would supply Asch with Internet connectivity services ("Internet services") for a monthly fee.  (Id.)  Asch began using TelCove's Internet services in February 2004.  (Id. at 4.)

TelCove sent a letter to Asch dated April 28, 2004, informing Asch that it was terminating the Agreement — pursuant to alleged violations of the Agreement's Acceptable Use Policy ("AUP") — effective noon on April 30, 2004. (Dkt. entry no. 26, 6-6-05 Affidavit of Michael Volin ("Volin Aff."), at Ex. P, 4-28-04 TelCove termination letter.) TelCove, after receiving a telephone call from Asch's counsel concerning the termination, agreed to continue providing Internet services to Asch. (Volin Aff., at Ex. Q, 5-26-04 TelCove termination letter; dkt. entry no. 24, 6-6-05 Affidavit of Joseph A. Martin ("Martin Aff."), at ¶¶ 3-5.) TelCove ceased providing Internet services to Asch on May 27, 2004. (Compl., at 5.)[1]

Asch brought this action against TelCove on June 3, 2004, alleging that, <u>inter alia</u>, TelCove breached the Agreement by terminating Internet services to Asch without proper notice or adequate justification. (Compl.) Asch also moved for temporary injunctive relief ("the TRO Motion") to require TelCove to resume providing Internet services to Asch. (Dkt. entry no. 2.) District Judge Thompson ("Judge Thompson"), on June 3, 2004, ordered that TelCove resume providing Internet services to Asch

---

[1] The parties dispute the reason for and the length of the extension of Internet services. (<u>See</u> Martin Aff., at ¶¶ 4-5 (stating parties did not limit extension to only 30 days); 5-26-04 TelCove termination letter (indicating that TelCove agreed to provide time for Asch to "procure services from an alternate provider").)

until the hearing on the TRO Motion.  (Dkt. entry no. 5.)  Judge Thompson, after holding a hearing on the TRO Motion on June 10, 2004 ("the TRO Hearing"), denied the motion because Asch had failed to demonstrate irreparable harm otherwise not compensable by money damages.  (Dkt. entry no. 4, 6-10-04 Transcript of TRO Hearing ("TRO Tr."), at 68; dkt. entry no. 6.)[2]

TelCove moved for summary judgment on April 29, 2005, and Asch cross-moved for summary judgment on June 6, 2005.  (Dkt. entry nos. 20, 23.)  The Court — after holding a hearing on July 29, 2005 — rendered an oral decision denying the motion and the cross motion.  (Dkt. entry no. 39, Transcript of Summary Judgment Hearing ("S.J. Tr."), at 19.)[3]  At the conclusion of the argument on July 29, 2005, the Court expressed concern about assertions made by TelCove in its summary judgment papers that Asch's president and sole shareholder, Mort Schneider ("Schneider"), and an individual named Robert Dosil ("Dosil") (1) submitted affidavits containing false information, and (2) testified falsely at the TRO Hearing and in their depositions.  (Id. at 20-21.)  Thus, the Court stayed proceedings in this action to give TelCove an opportunity to move to dismiss Asch's claims on the grounds that Asch had committed a "fraud on the Court."  (Id. at 21.)

---

[2] The action, by order of the Chief Judge for the District of New Jersey, was then reassigned to this Court.  (Dkt. entry no. 3.)

[3] The Court entered a formal written order denying the motion and the cross motion on that same date.  (Dkt. entry no. 38.)

TelCove moved to impose sanctions against Asch and Archer & Greiner on August 19, 2005.  (Dkt. entry no. 40.)  TelCove claims, inter alia, that Schneider "has lied, repeatedly, under oath in this case and others.  Not merely has he lied, but he and his counsel have submitted perjurious testimony to this Court on more than one occasion and have filed pleadings in violation of Rule 11."  (Def. Br., at 1.)  TelCove argues that Asch and Archer & Greiner have committed a fraud upon the Court and, as such, the Court should dismiss the complaint and require Asch and Archer & Greiner to pay TelCove's attorney's fees incurred in bringing the motion and in conducting additional unnecessary discovery.  (Id. at 16.)

Asch opposed the motion on September 19, 2005, and included with its opposition a "verification" from Schneider in which he responds to the alleged fraudulent misconduct.  (Dkt. entry no. 50, 9-19-09 Schneider Verification ("Schneider Verif.").)  Asch contends that "[a]lthough Mr. Schneider has at times not remembered every detail inquired by counsel for TelCove, there is no[] basis for claiming that he deliberate[ly] lied about or misrepresented any facts or attempted to mislead TelCove or the Court."  (Pl. Br., at 9.)  Furthermore, Asch argues that the circumstances of this case are "a far cry" from those cases in which courts have found a "fraud upon the court."  (Id. at 16.)

4

## DISCUSSION

TelCove moves to dismiss the complaint and to impose monetary sanctions pursuant to Rule 11 and the Court's inherent power.  The Court addresses each argument in turn.[4]

**I.   The Court's Authority to Sanction**

**A.   Generally**

"[D]istrict courts have broad authority to preserve and protect their essential functions.  To ensure that district courts have tools available to protect their truth-seeking process, the Federal Rules of Civil Procedure allow district courts to sanction parties who fail to meet minimum standards of conduct in many different contexts."  See Republic of Phil. v. Westinghouse Elec. Corp., 43 F.3d 65, 73 (3d Cir. 1994) (citing (1) Rule 11 (groundless pleadings and other papers); (2) Rule 16(f) (failing to abide by pretrial orders); (3) Rules 26(g), 30(g), 37(d), and 37(g) (discovery abuses); (4) Rule 41(b) (involuntary dismissal for failing to prosecute, failing to follow rules, or failing to obey court order); (5) Rule 45(f) (disobeying subpoena); and (6) Rule 56(g) (providing affidavit at summary judgment in bad faith or for delay)).  District courts also have statutory authority to "police misconduct."  See id. (citing 18 U.S.C. § 401 (contempt power) and 28 U.S.C. § 1927 (punishing attorneys who vexatiously multiply proceedings)).

---

[4] Asch did not specifically address TelCove's Rule 11 argument in its opposition brief.

5

"Th[e]se formal rules and legislative dictates [do not] exhaust district courts' power to control misbehaving litigants." Id.  On the contrary, district courts have "'[c]ertain implied powers . . . necessarily result[ing] . . . from the nature of their institution,' . . . 'which cannot be dispensed with in a Court because they are necessary to the exercise of all others.'" Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (citations omitted). Thus, district courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Id. (citations omitted).  Here, TelCove seeks sanctions against Asch and Archer & Greiner pursuant to (1) Rule 11's prohibition against signing false pleadings or other papers, and (2) the Court's inherent power to prevent a fraud on the Court.  (Def. Br., at 13-16.)

**B.   Rule 11**

Rule 11(c) authorizes a district court to impose sanctions on a party, the party's counsel, or both, for filing or signing "a pleading, written motion, or other paper," if, inter alia, (1) the document was "presented for an[] improper purpose;" or (2) the document contained (a) "allegations or [other] factual contentions" that did not have evidentiary support, or (b) denials of an opponent's "factual contentions" without evidentiary support.  Id.; see Bus. Guides v. Chromatic Commc'ns Ent., 498 U.S. 533, 545-54 (1991) (concluding that Rule 11 imposes same

requirement — objectively reasonable prefiling inquiry — on client who signs papers filed with court as it imposes on attorney who does so).  Rule 11 "targets abuse, making sanctions appropriate only if the filing of the complaint [or other paper] constitute[s] abusive litigation or misuse of the court's process."  Simmerman v. Corino, 27 F.3d 58, 62 (3d Cir. 1994) (internal quotations and citation omitted).  "At a minimum, Rule 11 requires 'unambiguously that any signer must conduct a "reasonable inquiry" or face sanctions.'"  Slater v. Skyhawk Transp., 187 F.R.D. 185, 199 (D.N.J. 1999) (quoting Bus. Guides, 498 U.S. at 547); see Gaiardo v. Ethyl Corp., 835 F.2d 479, 483 (3d Cir. 1987) ("The goal of Rule 11 . . . is [to] correct[] litigation abuse.").

The imposition of Rule 11 sanctions is reserved for only exceptional circumstances in which the claim or motion is patently unmeritorious or frivolous.  Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 289 (3d Cir. 1991) (citation omitted).  The Court, to find a Rule 11 violation, need not conclude that a party or an attorney acted in bad faith.  Martin v. Brown, 63 F.3d 1253, 1264 (3d Cir. 1995); Napier v. Thirty or More Unidentified Fed. Agents, Emps. or Officers, 855 F.2d 1080, 1090-91 (3d Cir. 1988) ("Rule 11 . . . is intended to discourage pleadings that are 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in

7

subjective bad faith.'").  Instead, the imposition of Rule 11 sanctions "requires only a showing of objectively unreasonable conduct."  <u>Fellheimer, Eichen & Braverman, P.C. v. Charter Techs.</u>, 57 F.3d 1215, 1225 (3d Cir. 1995).  "Reasonableness [is] defined as an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact."  <u>Ford Motor Co.</u>, 930 F.2d at 289 (internal quotations and citations omitted).  Therefore, in considering a motion to impose sanctions under Rule 11, the Court must determine that (1) the claims are objectively frivolous, and (2) the person who signed the pleadings or other papers should have been aware that they were frivolous.  <u>Baker v. Alderman</u>, 158 F.3d 516, 524 (11th Cir. 1998).

An appropriate sanction for a Rule 11 violation is one which

> is sufficient to deter repetition of such conduct or
> comparable conduct by others similarly situated.  The
> sanction may consist of, or include, directives of a
> nonmonetary nature, or an order to pay a penalty into
> court, or, if imposed on motion and warranted for
> effective deterrence, an order directing payment to the
> movant of some or all of the reasonable attorneys' fees
> and other expenses incurred as a direct result of the
> violation.  Thus, what is appropriate may be a warm-
> friendly discussion on the record, a hard-nosed
> reprimand in open court, compulsory legal education,
> monetary sanctions, or other measures appropriate to
> [the] circumstances.  Most importantly, in determining
> the appropriate sanction to impose, the court should
> consider the particular facts of [the] case, and [use]
> the sanction that furthers the purposes of Rule 11 and
> is the least severe sanction adequate to such purpose.

<u>Carlino v. Gloucester City High Sch.</u>, 57 F.Supp.2d 1, 39 (D.N.J. 1999).

8

**C.    The Court's Inherent Power**

Federal courts possess the inherent power to sanction misconduct.  <u>Chambers</u>, 501 U.S. at 43.  Nonetheless, "[i]f statutory or rules-based sanctions are entirely adequate, they should be invoked, rather than the inherent power."  <u>In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions</u>, 278 F.3d 175, 189 (3d Cir. 2002) (internal quotations and citation omitted).  Moreover, although the Court "need not exhaust all other sanctioning mechanisms prior to resorting to its inherent power, the court must explain why it has chosen any particular sanction from the range of alternatives it has identified."  <u>Republic of Phil.</u>, 43 F.3d at 74 (internal quotations and citations omitted).

Courts may exercise their inherent power "to impose sanctions on both litigants and attorneys to regulate their docket, to promote judicial efficiency, and to deter abuse of judicial process."  <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 505 (3d Cir. 1991).  In this regard, a district court

> may assess [an appropriate sanction] when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.  In such cases, the imposition of sanctions transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicat[ing] judicial authority without resort[ing] to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.
> This inherent power, however, must be exercised with restraint and discretion.  Although a court retains

the inherent right to sanction when rules of court or statutes also provide a vehicle for sanctioning misconduct, resort to these inherent powers is not preferred when other remedies are available. [G]enerally, a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists.  But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

A court must determine whether the party being sanctioned acted in bad faith before using its inherent power to impose sanctions.  A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees [or alternative sanctions] . . ..  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.

Moss v. McDonald's Corp., No. 03-5000, 2006 WL 680985, at *5-*6 (D.N.J. Mar. 13, 2006) (internal quotations and citations omitted).

District courts also possess the inherent power to impose the sanction of dismissal on one "who defiles the judicial system by committing a fraud on the court."  See Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (dismissing cause of action for "fraud upon the court" where plaintiff attached fake agreement to complaint).  However, dismissals with prejudice are drastic sanctions, even for a fraud upon the court, and a decision to impose such a sanction must be made with restraint and discretion.  Perna v. Elec. Data Corp., 916 F.Supp. 388, 397-98 (D.N.J. 1995); see, e.g., Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639, 643 (1976) (holding that, pursuant to Rule 37, "the District Judge did not abuse his discretion in finding bad faith on the part of [the parties for failing to comply with

a discovery order], and concluding that the extreme sanction of dismissal was appropriate in th[e] case by reason of [the parties'] 'flagrant bad faith' and their counsel's 'callous disregard' of their responsibilities").

A fraud upon the court

occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

Aoude, 892 F.2d at 1118 (citations omitted).  Thus, a party seeking to prove fraud upon the court, must show by "clear, unequivocal and convincing evidence": "(1) intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court."  Herring v. United States, 424 F.3d 384, 386-87, 390 (3d Cir. 2005).[5]  "[A] determination of fraud on the court may be justified only by 'the most egregious misconduct directed to the court itself.'"  Id.; see Aoude, 892 F.2d at 1118 ("Because dismissal sounds 'the death

---

[5] See, e.g., Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1472-73 (D.C. Cir. 1995) (concluding that court may not enter default under inherent power unless, inter alia, court finds by clear and convincing evidence that abusive behavior occurred); Aoude, 892 F.2d at 1118 (requiring clear and convincing evidence in context of dismissal based upon "fraud on the court"); Pfizer, Inc. v. Int'l Rectifier Corp., 538 F.2d 180, 195 (8th Cir. 1976) (reversing district court's grant of summary judgment as sanction for withholding a document in discovery because "fraud on the court" was not supported by "clear, unequivocal and convincing evidence").

11

knell of the lawsuit,' district courts must reserve such strong
medicine for instances where the defaulting party's misconduct is
correspondingly egregious.")  Egregious conduct includes, <u>inter
alia</u>, "bribery of a judge or jury or fabrication of evidence by
counsel."  <u>Herring</u>, 424 F.3d at 390 (citation omitted).  Also, an
"officer of the court" must have perpetrated the fraud and, as
such, "perjury by a witness is not enough to constitute fraud
upon the court."  <u>Id.</u>; <u>see, e.g.</u>, <u>Geo P. Reintjes Co. v. Riley
Stoker Corp.</u>, 71 F.3d 44, 49 (1st Cir. 1995) ("The possibility of
perjury, even concerted, is a common hazard of the adversary
process with which litigants are equipped to deal through
discovery and cross-examination.").

    "In a perjury case, the plaintiff must prove that the
allegedly perjurious statement is not subject to a literal,
truthful interpretation."  <u>Herring</u>, 424 F.3d at 391 (citing
<u>United States v. Tonelli</u>, 577 F.2d 194, 198 (3d Cir. 1978)).  In
a case, such as this one, where an accusation of perjury forms a
basis of the fraud upon the court claim, "proof of perjury,
though not sufficient to prove fraud upon the court, becomes a
necessary element which must be met before going on to meet the
additional rigors of proving fraud upon the court."  <u>Id.</u>
Therefore, if a "party lies to the court and his adversary
intentionally, repeatedly, and about issues that are central to
the truth-finding process, it can fairly be said that [the party]
has forfeited his right to have [the] claim decided on the

merits." <u>McMunn v. Mem'l Sloan-Kettering Cancer Ctr.</u>, 191
F.Supp.2d 440, 445 (S.D.N.Y. 2002).[6]

## II.  Analysis

TelCove contends that the Court should grant the motion to
impose sanctions — pursuant to Rule 11 and the Court's inherent
power — based on the following alleged instances of lying,
submitting perjurious testimony, and filing fraudulent
documents:[7]

### A.   Whether Asch "Hosted" Pornography (Generally)

#### 1.   TelCove's Allegations

TelCove has alleged that Asch breached the Agreement by,
<u>inter alia</u>, "provid[ing] service to customers who engaged in

---

[6] Both parties rely on the test adopted by the court in
<u>Perna v. Electronic Data Corp.</u>, 916 F.Supp. 388 (D.N.J. 1995), to
determine whether dismissal of a complaint is an appropriate
sanction for fraud upon the court. <u>Perna</u> identified the
following six-factors for a court to consider in determining
whether to dismiss a complaint:

> (1) the existence of certain extraordinary
> circumstances;
> (2) the presence of willfulness, bad faith, or fault by
> the offending party;
> (3) the consideration of lesser sanctions to rectify
> the wrong and to deter similar conduct in the future;
> (4) the relationship or nexus between the misconduct
> drawing the dismissal sanction and the matters in
> controversy in the case;
> (5) prejudice and the public interest; and
> (6) the degree of the wrongdoer's culpability.

<u>Id.</u> at 398.  For sake of completeness, the Court will analyze
TelCove's claims of fraud upon the Court pursuant to the <u>Herring</u>
and <u>Perna</u> standards.

[7] The Court, finding that the objects of alleged misconduct
can be organized into categories, examines each of the
allegations by topic in light of the factors described <u>infra</u>.

pornography" in violation of the AUP.  (Dkt. entry no. 20, 4-29-05 Def. Br. in Support of Mot. for S.J. ("Def. S.J. Br."), at 1, 3.)  The issue of whether Asch violated the AUP is one of the material issues in this litigation.  As such, Schneider was asked by his counsel at the TRO Hearing whether he hosted any pornographers.  (TRO Tr., at 46.)  Schneider testified that not only did Asch not host any pornographers, but that if he found out that a customer was transmitting pornography, he would terminate the customer immediately.  (Id.)  During Schneider's deposition on January 1, 2005, he again denied hosting "pornographers," and claimed that no one ever asked him to host pornography on his network.  (8-24-05 Affidavit of Thomas G. Rohback ("8-24-05 Rohback Aff."), at Ex. 2, 1-25-05 Schneider Deposition Tr. ("Schneider Dep."), at 122-23, 127.)

During the same deposition, however, Schneider testified that he previously hosted pornographic sites on his network. (Schneider Dep., at 40, 42.)  TelCove also confronted Schneider at his deposition with an e-mail string initiated by a prospective customer in late January 2004, which was after the parties signed the Agreement but before TelCove began providing Internet services.  (Id. at 151-52; 8-24-05 Rohback Aff., at Ex. 4.)  In the e-mail, the prospective customer asked Schneider if Asch hosted "adult content sites."  (Schneider Dep., at 151-52; 8-24-05 Rohback Aff., at Ex. 4.)  The e-mail string showed that Schneider responded to the inquiry by stating that (1) Asch did

host "adult content" servers "[a]s long as it is not illegal, i.e., child porn, etc.," and (2) "[a]ll of our adult content sites are on dedicated or co located servers." (Schneider Dep., at 151-52; 8-24-05 Rohback Aff., at Ex. 4.) After being questioned about this e-mail during the deposition, Schneider acknowledged that hosting "adult content" servers was "part of [his] business." (Schneider Dep., at 151-52.)

> 2. Asch's Response

Schneider responds to TelCove's allegation of perjury regarding his statements about whether Asch hosted pornography by asserting that his testimony during the TRO Hearing was correct. (See Schneider Verif., at ¶ 33 (stating that he "stands by" his TRO Hearing testimony).) He claims that, as of January 27, 2004, Asch was hosting approximately five "adult content sites," and that the two displaying sexually explicit images were no longer Asch's customers by the end of February 2004. (Id. at ¶ 36.) Schneider also believes that none of these sites sent unsolicited e-mails, nor were they the subject of TelCove's complaints. (Id.)

> 3. Conclusion

The Court finds that TelCove has not demonstrated that Schneider's inconsistent statements at the TRO Hearing and at his deposition constitute a fraud upon the Court. First, the Court, applying the Herring standard, finds that TelCove has not shown by clear and convincing evidence that (1) Archer & Greiner, counsel for Asch and Schneider, was involved in making the

inconsistent statements, (2) "egregious circumstances" exist, or
(3) Schneider acted with an intent to deceive.  Second, the
Court, applying the <u>Perna</u> standard, finds that although
Schneider's statements are directly related to and relevant to a
material issue in the case, TelCove has not demonstrated that (1)
Schneider made the statements in bad faith, or (2) certain
extraordinary circumstances exist.

　　　All of the questions asked to Schneider at the TRO Hearing
and at his deposition concern his hosting or being asked about
hosting "pornography."  Although Schneider admits that he was
asked by prospective customers to host "adult content sites" and
that he actually hosted "adult content sites," he disputes the
characterization of "adult content sites" as constituting
"pornography."  (<u>See</u> Schneider Dep., at 126-28, 157-58
(testifying that he did not understand "adult content" to mean
"sexually explicit material," and indicating his belief that
"adult content" included "commercial[s] about erectile
dysfunction").)  The resolution of Schneider's interpretation of
the terms "adult content" and "pornography," and whether Asch's
hosting of "adult content sites" violated the AUP is a question
of fact to be resolved by the jury.  Moreover, the jury will be
able to analyze the inconsistencies in his testimony, and
otherwise assess his credibility concerning his argument that
"adult content" does not constitute "pornography."  Accordingly,
the Court will not impose sanctions where the Court would have to

16

"implicitly engage in fact finding that is typically reserved for a jury." In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 796 (3d Cir. 1999) (citation omitted).

**B.   Whether Asch Hosted Pornography (Relationship with IQ Web)**

    1.   TelCove's Allegations

TelCove submitted e-mail complaints and other documents in support of its motion for summary judgment, which indicated that one of Asch's customers, IQ Web, was involved in distributing pornography. (Def. S.J. Br., at 4-8.)  During his deposition, Schneider admitted that IQ Web was Asch's customer, but claimed that "the only way [he] kn[e]w of them allegedly being involved in pornography is because you folks [i.e., TelCove] told [him] that." (Schneider Dep., at 134-35.)  Schneider also stated in his verification that Asch's business relationship ended with any entities that hosted sexually graphic images by late February 2004. (Schneider Ver., at ¶ 36.)

During Schneider's deposition, TelCove produced e-mail correspondence between Schneider and someone named "Laurent" who worked for IQ Web. (8-24-05 Rohback Aff., at Ex. 5, January 2004 e-mail correspondence between Schneider and Laurent ("IQ Corresp."); Schneider Dep., at 156-57.)  Laurent asked Schneider whether Asch accepted adult mailers on January 9, 2004. (IQ Corresp.; Schneider Dep., at 156-57.)  Schneider responded by stating, "AS [sic] far as the adult material, if you have opt in information, that is good enough for me.  Our only caveat is that

17

if it is illegal, it is not to be on our network.  Adult material is not illegal.  Child porn is."  (IQ Corresp.; Schneider Dep., at 156-57.)

Schneider also testified during his deposition that he knew that Laurent was going to put adult content on his server. (Schneider Dep., at 157.)  Schneider further testified during his deposition that, after receiving a complaint from a non-subscribing Internet user about IQ Web sending sexually graphic e-mail, he merely asked IQ Web to remove the complainant from its mailing list and did not terminate his relationship with IQ Web despite knowing that it distributed sexually graphic images. (Id. at 171.)  TelCove also confronted Schneider during his deposition with complaints Asch received in Spring 2004 from Internet users receiving pornography from I.P. addresses that Asch issued to IQ Web.  (8-24-05 Rohback Aff., at Ex. 3.)

2.    Asch's Response

Schneider claims to have first learned that IQ Web was distributing e-mail with "sexually offensive images" in late February 2004.  (Schneider Verif., at ¶ 37.)  As a result, Schneider alleges that he no longer permitted IQ Web to send e-mails, and he converted its mail server to a "bounce server." (Id.)  Concerning the complaints that TelCove alleges came from IQ Web, Schneider contends that "[a]lthough the[] e-mails [referring to sexually offensive information or images Asch received after February 2004] reference . . . IP addresses

18

allocated by [TelCove] to Asch, it appears that the e-mails make
reference to those IP addresses only because IQ Web listed those
addresses as its 'bounce server.'"   (Id. at ¶ 39.)   Therefore,
Schneider argues that the sexually explicit e-mails did not
originate from Asch's customers.   (Id. at ¶ 40.)

      3.   Conclusion

The Court finds that TelCove has not demonstrated that
Schneider's statements at his deposition concerning IQ Web
constitute a fraud upon the Court under Herring or Perna for the
same reasons discussed infra.   Although TelCove produced e-mail
correspondence indicating that Schneider knew that IQ Web would
be providing "adult content," the e-mail does not specifically
discuss "pornography."   Also, upon learning that IQ Web
distributed sexually graphic images, Schneider alleges that he
terminated IQ Web's e-mail service.   The questions of fact
regarding (1) whether IQ Web sent the pornographic e-mails
included in the complaints, and (2) whether Asch's customers sent
unsolicited pornographic e-mails, will be resolved by the jury.
Schneider will have the opportunity to explain why he did not
terminate, but merely modified, his business relationship with IQ
Web after receiving the complaints when he previously testified
at the TRO Hearing that he would "immediately terminate" any
customer transmitting sexually graphic material.   Furthermore, at
this stage in the litigation, TelCove has not presented a proper

Rule 11 motion about the veracity of Schneider's verification
and, as such, the Court will not consider TelCove's arguments
concerning same at this time.

   **C.   The Chawla Complaint and The Number of Complaints**

      1.   TelCove's Allegations

   During the TRO Hearing, Archer & Greiner showed Schneider a
complaint from Internet-user Angie Chawla ("the Chawla Complaint")
— e-mailed to Asch and TelCove on May 13, 2004 — complaining
about pornography spam at IP address 64.9.17.250.  (TRO Tr., at
47-48; 8-24-05 Rohback Aff., at Ex. 6.)  Schneider testified at
the TRO hearing that he first saw the Chawla Complaint when his
counsel faxed it to him a few days earlier.  (TRO Tr., at 47-48.)
During the TRO Hearing, Archer & Greiner also showed Schneider
additional Internet-user complaints about Asch's customers
sending unsolicited spam and pornography, and Schneider testified
that the five complaints presented to him by Archer & Greiner
during the TRO Hearing were the only complaints that he ever
received.  (Id. at 47.)

   During Schneider's deposition, TelCove's counsel showed him
the Chawla Complaint.  (Schneider Dep., at 194-95.)  TelCove's
counsel asked Schneider whether he recognized the Chawla
Complaint and he stated, "Well, I'm sure I did see it."  (Id. at
194.)  TelCove alleges that this response contradicted his
testimony at the TRO Hearing that he never saw the Chawla

20

Complaint until a few days before the TRO Hearing.  (Def. Br., at 4-5.)  Schneider further testified during his deposition that he replied to the Chawla Complaint and told IQ Web to remove her from its lists.  (Schneider Dep., at 195, 198.)  Also, contrary to his testimony at the TRO Hearing, where he indicated that the five Internet-user complaints that Archer & Greiner showed him were the only complaints that he ever received, Schneider admitted during his deposition that he had actually received between 10 and 100 complaints of spam and pornography.  (Id. at 49-50.)

  2. Asch's Response

Schneider claims that his TRO Hearing testimony, "when certain events were more clear in [his] mind" was more accurate than his deposition testimony.  (Id. at 195; Schneider Verif., at ¶ 32.)  Schneider argues that he repeatedly told TelCove's counsel during his deposition that he believed that he responded to Chawla, but could not recall any specifics.  (Schneider Dep., at 195, 198; Schneider Verif., at ¶ 32.)  Schneider also stated during his deposition that, if in fact TelCove had no correspondence from him indicating that he responded, that it was likely that he never responded to Chawla.  (Schneider Verif., at ¶¶ 31, 32.)

  3. Conclusion

The Court finds that TelCove has not demonstrated that Schneider's statements concerning his receipt of and possible

response to the Chawla Complaint constitutes a fraud upon the
Court under <u>Herring</u> or <u>Perna</u> for the same reasons discussed
<u>infra</u>.  The Court notes that Schneider did not address TelCove's
argument in the motion to impose sanctions concerning the
allegedly false testimony about the number of complaints that
Asch received, but reiterates that this is also an issue that may
be properly resolved by a jury.  Moreover, Schneider's
inconsistent testimony concerning when he actually received and
reviewed the Chawla Complaint and his possible response thereto
is inessential to the material issues in this case.

### D.   Asch's Contract With Another Internet Service Provider

#### 1.   TelCove's Allegations

At the TRO Hearing, Schneider testified that he had already
signed a contract with an alternative Internet service provider
("ISP"), and was "awaiting an installation date."  (TRO Tr., at
65.)  However, during Schneider's deposition, he stated that he
actually did not have a contract signed with another ISP in June
2004, but instead was simply negotiating with another ISP at that
time.  (Schneider Dep., at 174-75.)

#### 2.   Asch's Response

Schneider, after reviewing his files, confirms that Asch did
have a contract with a different ISP, named ATI, which was signed
on May 26, 2004.  (Schneider Verif., at ¶ 21.)  Schneider asserts
that he terminated the contract with ATI because he could not

22

afford the monthly fees.  (<u>Id.</u> at ¶ 23.)  Concerning his divergent testimony about whether he had a signed contract with another ISP as of the date of the TRO Hearing, Schneider claims that his TRO Hearing testimony was accurate, and that he had simply forgotten about the contract with ATI at the time of his deposition.  (<u>Id.</u>)

### 3.   TelCove's Reply

TelCove points out that Schneider was the only signatory to the alleged contract with ATI.  (Def. Reply Br., at 9.)  TelCove further claims that it asked Asch — in an interrogatory — to provide a list of all companies that provided Asch with Internet services and that Asch did not include ATI in its response. (Def. Reply Br., at 9; 9-27-05 Rohback Supp. Aff., at Ex. 9, Asch's Resp. to TelCove's First Set of Interrogatories ("Asch's 1st Rog. Resp."), Ex. 10, Asch's Supplemental Resp. to TelCove's First Set of Interrogatories ("Asch's Supp. Rog. Resp.").) TelCove also asserts that Schneider failed to mention ATI when asked during his deposition to identify all companies from which he sought Internet service following TelCove's termination notice.  (Schneider Dep., at 66-69, 74-75, 88-89.)

### 4.   Conclusion

The Court finds that TelCove has not demonstrated that Schneider's inconsistent testimony regarding whether he had a signed agreement with another ISP as of the date of the TRO Hearing constitutes a fraud upon the Court under <u>Herring</u> or <u>Perna</u>

for the same reasons discussed _infra_.  Schneider attached a copy
of the alleged contract with ATI to his verification and stated
that he did not recall the ATI contract at the time of his
deposition.  Even if Schneider testified falsely about having a
contract with ATI, TelCove has not shown that Schneider's
testimony at the TRO Hearing or during his deposition was made in
bad faith or with knowledge that it was false.  In addition, the
issue of whether Asch acquired an ISP after TelCove ceased
providing Internet services is another tangential issue not going
to the material issues in the case, but rather concerns — only to
the extent that TelCove is potentially found to have breached the
Agreement — the amount of any damage award.

 The Court further finds TelCove's argument that the contract
is patently invalid because it lacks a signature from ATI to be
unsubstantiated and without merit.  First, TelCove has not shown
that ATI needed to sign the contract for it to become binding
upon the parties.  Second, the Court notes that (1) the contract
appears to only require the signature of the customer, and (2)
the customer's signature on the contract "constitutes a firm
circuit order."  (Schneider Verif., at Ex. F.)

  **E.   Asch's Acquisition of Opt-in Lists**

   1.   TelCove's Allegations

 TelCove notes that Schneider submitted an affidavit in
support of the TRO Motion claiming that Asch had its customers'

"opt-in lists" to assist Asch in determining whether they were distributing unrequested spam or pornography.  (6-2-04 Schneider Aff., at ¶ 5.)  Schneider repeated this factual allegation in the verified complaint in this case, and in an affidavit and verified complaint submitted in a similar action brought by Asch against MCI.  (Compl., at ¶ 6; Civil Action No. 03-4809 (FLW) ("MCI Action"), dkt. entry no. 1, Compl., at ¶ 7, 10-10-03 Schneider Aff., at ¶ 5.)[8]  TelCove also explains that Asch stated in its response to TelCove's request for production of documents that it (1) obtains opt-in lists after receiving Internet-user complaints concerning specific customers, and (2) would produce any such lists it obtained.  (8-24-05 Rohback Aff., at Ex. 15, Asch's Response to TelCove's Request for Production of Documents, at 2-3.)  However, Asch never produced any of its customers' opt-in lists to TelCove.  (Def. Br., at 7.)  At his deposition, Schneider stated that he has never obtained opt-in lists from his customers.  (Schneider Dep., at 48, 54.)

    2.  Asch's Response

    Schneider claims that despite the language used concerning "opt-in lists" in the complaint in this case, and the complaint and affidavit in the MCI Action, "Asch does not require its customers to deliver their 'opt-in' lists to Asch when they sign

---

[8] In the MCI Action, Asch also sought injunctive relief and damages for breach of contract.  (MCI Action, Compl.)

up for Asch's services, but only to provide the opt-in
information regarding a specific e mail [sic] address when
requested by Asch in the event of a complaint or concern."
(Schneider Verif., at ¶ 25.)   Schneider also claims that TelCove
knew of Asch's policies (described above) concerning customer
opt-in lists as demonstrated in correspondence between the
parties in November 2003.  (Id. at ¶ 26 & Ex. G.)  Schneider
admits that he possibly could have been "more precise in the
wording of [his] Affidavit."  (Id. at ¶ 28.)

     3.   Conclusion

    The Court finds that TelCove has not demonstrated that Rule
11 sanctions are warranted for the misstatement in Asch's
complaint in this case concerning "opt-in lists."  TelCove has
not shown that Schneider exhibited objectively unreasonable
conduct in the filing of the complaint in this action.  Although
the literal reading of the paragraph concerning opt-in lists is
admittedly incorrect, TelCove has not shown that the phrasing is
frivolous, especially in light of the parties' communications
about Asch's policy prior to entering into the Agreement.
Furthermore, the Court declines to find that Asch and Archer &
Greiner have committed a fraud upon the Court by including this
provision in the complaint.  Schneider provided a possible
truthful interpretation of the discrepancy, and TelCove has not
shown that (1) the statement in the complaint was made in bad

faith, or (2) Asch's acquisition or non-acquisition of opt-in lists — before actually receiving complaints about unsolicited spam or pornography — is a material issue in this case.

**F.   Schneider's Relationship With Dosil**

    1.   TelCove's Allegations

        a.   Schneider's business relationship with Dosil

In a response to TelCove's interrogatories, Schneider stated that Dosil had accompanied him to the TRO Hearing.  (Def. Br., at 8.)  Schneider further indicated in his interrogatory response that Dosil was "a personal friend."  (<u>Id.</u> at 9.)  During Schneider's deposition, he repeated his assertion that (1) Dosil was "[j]ust a friend," (2) Dosil had no connection to Asch's business, and (3) Dosil never conducted business with him. (Schneider Dep., at 102; Asch's 1st Rog. Resp.)  Schneider verifies that he and Dosil "never actually started any businesses together."  (Schneider Verif., at ¶ 14.)  Dosil also testified during his deposition that he has never been an officer or employee of Asch.  (8-24-05 Rohback Aff., at Ex. 16, 2-23-05 Transcript of Robert Dosil's Deposition ("Dosil Dep."), at 79.)

During Dosil's deposition, he admitted to (1) attending a meeting with Schneider and a salesperson from TelCove, and (2) attempting to negotiate a lower price for services on Asch's behalf.  (Dosil Dep., at 99-100.)  Dosil also stated during his deposition that he had — prior to the Agreement — negotiated an agreement on Asch's behalf with WorldCom.  (<u>Id.</u> at 74.)

In Asch's motion for a temporary restraining order in the MCI Action, Dosil submitted an affidavit asserting that he was, in fact, "the Operations Manager of plaintiff Asch Webhosting, Inc. ('Asch Web')."  (8-24-05 Rohback Aff., at Ex. 23, 10-24-03 Dosil Aff. ("MCI Dosil Aff."), at ¶ 1; MCI Action, dkt. entry no. 15.)  During Dosil's deposition, he testified that he signed the affidavit — despite knowing that he was not the Operations Manager of Asch — because Asch's counsel told him to do so and because he was looking out for Schneider's "best interest." (Dosil Dep., at 80-81.)  Dosil also claims that he acted as a type of "operations manager" to cut the deal with MCI.  (Id. at 81-83.)

TelCove produced documents rebutting Schneider's contention that he and Dosil never engaged in any businesses together. TelCove compiled documents indicating that (1) a business entity called "Dosil & Schneider" entered into an agreement — in which Dosil and Schneider co-signed — for Internet services with Monmouth Telecom ("Monmouth") in July 2004, and (2) a business entity called "CoLo Headquarters" entered into an agreement — in which Dosil and Schneider also co-signed — with Monmouth in September 2004.  (8-24-05 Rohback Aff., at Ex. 17.)  Dosil and Schneider both testified during their depositions that they attempted to start a business together called "Disaster Recovery Relief," but that it "never got off the ground."  (Dosil Dep., at 77; Schneider Dep., at 206-08.)  Schneider also testified that

their two agreements with Monmouth were part of their failed Disaster Recovery Relief business, and that they terminated the service after having it installed and paying for the service for a month or two.  (Schneider Dep., at 145-49; Schneider Verif., at ¶ 16.)

        b.   Videos

During Schneider's deposition, he testified that Dosil was never involved in the video business or the Internet business. (Schneider Dep., at 146.)  However, later in his deposition, Schneider testified that he was familiar with Dosil's business venture called "Gang Bang Video" and stated his belief that the business was not involved with pornography.  (Id. at 212-13.) Schneider has further stated that (1) he was never involved with Gang Bang Video's website, bangbangvideo.com, and (2) he did not believe that the website ever went live.  (Id.; Schneider Verif., at ¶ 17.)

During Dosil's deposition, he testified that Gang Bang Video did involve adult movies.  (Dosil Dep., at 33-34.)  TelCove also provides documentation — in support of its motion to impose sanctions — showing that "bangbangvideo.com" was listed as a domain name on Asch's network and that Asch had assigned a specific IP address to it.  (8-24-05 Rohback Aff., at Ex. 18.) TelCove conducted a search of archived webpages, which indicated that as early as 2002, bangbangvideo.com went live and received at least 942 hits.  (8-24-05 Rohback Aff., at Ex. 19.)  TelCove

points out that these archived pages show that the website was designed by Schneider's company, Go Design.org, in association with Aschwebhosting.com.  (<u>Id.</u>)

       c.   Dosil's address

TelCove argues that Schneider also lied about Dosil's address.  Specifically, TelCove points out that Schneider's interrogatory responses listed Dosil's address at "1008 English Lane, Toms River, New Jersey."  (Asch 1st Rog. Resp.)  However, when TelCove attempted to serve Dosil with a subpoena at the above address, it was told that Dosil did not live there.  (8-24-05 Rohback Aff., at Ex. 21.)  Dosil testified at his deposition that he was living at Asch's business address — on Schneider's farm — for the past few years.  (Dosil Dep., at 30.)

       d.   Dosil's knowledge of spam

Dosil's affidavit in the MCI Action stated, "I, like Mr. Schneider, was aware of the many issues associated with Spammers."  (MCI Dosil Aff., at ¶ 6.)  During Dosil's deposition, however, he admitted to not being "aware of the many issues associated with spammers," and when asked to identify spam, he stated that he (1) did not know what spam was, and (2) "[i]t comes in a can.  What's that, like ground-up ham?"  (Dosil Dep., at 51, 84-85.)

2.   Asch's Response

   a.   Regarding Schneider's business relationship
        with Dosil

Asch argues that any previous testimony by Dosil or any business relationships between the two are irrelevant because "no party has contended that Mr. Dosil is a witness with any information relevant to the claims in this case." (Pl. Br., at 7.)[9]  Schneider asserts that

> Dosil has never been an owner, operator or employee of Asch and Asch has never paid him any money in connection with the business of Asch.  Mr. Dosil is a family friend.  I have on occasion discussed the business of Asch with Mr. Dosil and he has attempted to assist me by making phone calls and by providing advice.

(Schneider Verif., at ¶ 7.)  Schneider claims that he does not know why Dosil stated that he was the Operations Manager of Asch in his affidavit in the MCI Action.  (Id. at ¶ 8.)  Concerning any other business ventures, Schneider states that he and Dosil "discussed going into business together and took preliminary steps in that direction on one occasion, [but] never actually started any businesses together and [he] never entered into any business partnership with [Dosil]." (Id. at ¶ 14.)  Moreover, Schneider points out that his discussions with Dosil only occurred after TelCove terminated Asch's Internet services.  (Id. at ¶ 15.)

---

[9] TelCove claims that Asch has indicated in its initial disclosures that Dosil is a potential person with discoverable information that Asch might call as a witness in this case. (Def. Reply. Br., at 6-7.)

b.   Videos

Schneider states that he was never involved in Dosil's Gang Bang Video business, nor did he know the details of it.  (Id. at ¶ 17.)  Schneider also disagrees with TelCove's contention that the bangbangvideo.com website went "live" or that it was a functional website.  (Id. at ¶ 20.)  Schneider acknowledged in his verification that the "bangbangvideo.com" website was on his network and was accessed on his network, but claims that the last time it was accessed was in February 2003.  (Id. at ¶ 19.)

c.   Dosil's address

Schneider states that he and his wife own property approximately 2.5 miles away from their principal residence and that for the past several years, Dosil has "helped oversee the property," and "make use of the small farmhouse" there.  (Id. at ¶ 11.)  Schneider believes that Asch correctly indicated Dosil's address in its interrogatory responses, and that Dosil receives his mail at that address.  (Id. at ¶ 12.)  Also, Schneider attaches to his verification a copy of Dosil's current driver's license, which indicates that the English Lane address is his registered address.  (Id. at ¶ 13 & Ex. C.)

d.   Dosil's knowledge of spam

Schneider claims that he discussed spam with Dosil and that he believes Dosil understood what spam was at the time of his deposition.  (Id. at ¶ 9.)  Asch notes that Dosil acknowledges

32

later in his deposition that he can identify spam.  (Dosil Dep.,
at 67-68; Pl. Br., at 6.)  Asch further argues that Dosil's
statement that he only knows "spam" as a product that comes in a
can was Dosil's attempt to "continu[e] to be cute — and less than
forthcoming — in his deposition."  (Id. at 6-7.)

       3.   Conclusion

     The Court finds that TelCove has not demonstrated that the
highly inconsistent and contradictory testimony and documentation
regarding Asch's relationship with Dosil constitutes a fraud on
the Court.  Concerning the Herring standard, Archer & Greiner
filed an affidavit with the Court indicating that they drafted
Dosil's affidavit in the MCI Action exactly as Dosil directed.
(Dkt. entry no. 50, 9-16-05 Joseph A. Martin Aff.)  TelCove has
not provided the Court with documentation or other evidence
indicating that Archer & Greiner participated in any possible
perjurious statements by Dosil.  Therefore, TelCove has not shown
that Asch and Archer & Greiner have committed a fraud upon the
Court pursuant to Herring.  In addition, the Court finds that
TelCove has not demonstrated that Asch and Archer & Greiner
committed a fraud upon the Court under Perna because: (1) there
is no showing that Asch and Archer & Greiner acted in bad faith,
and (2) most of the inconsistent or possibly false testimony
regarding (a) Dosil's address, (b) Dosil and Schneider's alleged
participation in Gang Bang Video or its website, and (3) Dosil's

knowledge of spam, are not related to material issues in this litigation.

The Court finds, however, that Dosil's conduct during his deposition was surreptitious and unacceptable.  Even Asch acknowledges that Dosil was being "less than forthcoming" in his deposition.  Furthermore, Dosil's conduct during his deposition demonstrates an utter disregard of the judicial process and the integrity of the judicial system.

Although Asch now claims — despite listing Dosil as a person with knowledge and a possible witness — that Dosil has no information relevant to the dispute in this action, the Court is placing Asch and Archer & Greiner on notice as to the possible consequences of including Dosil as a witness here.  First, because of Dosil's completely contradictory testimony concerning his relationship as an "Operations Manager," the Court may consider an argument under Federal Rule of Evidence 403 to exclude Dosil as a witness due to the likelihood of Dosil's testimony confusing or misleading the jury.  Second, if Dosil is called as a witness, it is likely that counsel from Archer & Greiner, including Joseph A. Martin, Esquire, who prepared Dosil's affidavit in the MCI Action, would be called as witness concerning the creation of and the veracity of Dosil's affidavit in the MCI Action.  This would raise possible ethical considerations involving New Jersey Rules of Professional Conduct

34

("NJRPC") 3.7, 1.7, and 1.9.[10]  Finally, if Dosil testifies in
accordance with his patently inconsistent deposition testimony,
the Court would consider a specific jury instruction evaluating
Dosil's credibility in light of his conduct in this action and in
the MCI Action, and the Court will notify Dosil, outside of the
presence of the jury, of his exposure for a possible referral for
perjury.

### G.   Schneider's Law Degree

   1.   TelCove's Allegations

   During the TRO Hearing, Schneider testified that he received
a Juris Doctor from the University of California at Northridge in
1977.  (TRO Tr., at 7-8, 36.)  Schneider repeated this assertion
during his deposition.  (Schneider Dep., at 7-8.)  TelCove
produced documentation indicating that the University of
California did not have a campus at Northridge in 1977, nor did
it ever have a law school there.  (Dkt. entry no. 47, 8-24-05
Affidavit of Eliana Almache.)

---

   [10] The Court reminds Archer & Greiner that its conduct before
this Court is governed by the Rules of Professional Conduct of
the American Bar Association as revised by the New Jersey Supreme
Court ("RPC").  Local Civil Rule 103.1(a); see also N.J.Ct.R.
1:14 (adopting Rules of Professional Conduct of the American Bar
Association).  RPC 3.3(a) provides that "[a] lawyer shall not
knowingly: (1) make a false statement of material fact or law to
a tribunal; . . . [or] (4) offer evidence that the lawyer knows
to be false."  Id.  Also, RPC 3.4(b) prohibits a lawyer from
"counsel[ing] or assist[ing] a witness to testify falsely."  Id.
Moreover, RPC 8.4 provides that "[i]t is professional misconduct
for a lawyer to: (c) engage in conduct involving dishonesty,
fraud, deceit or misrepresentation; or (d) engage in conduct that
is prejudicial to the administration of justice."  Id.

2.    Asch's Response

Schneider states in his verification that he did not attend the University of California; instead, he attended the University of San Fernando Valley School of Law [("USFV Law")]." (Schneider Verif., at ¶ 3.)  Schneider claims that USFV Law was "commonly referred to by all fellow East Coast students as the law school at Northridge."  (Id. at ¶ 4.)  Schneider points out that USFV Law eventually became the University of La Verne School of Law. (Id.)  Regardless, Schneider claims that he has "not become a member of any Bar and have never held [himself] out as an attorney or claimed to have any legal knowledge or expertise." (Id. at ¶ 6.)

3.    TelCove's Reply

USFV Law is not accredited by the ABA.  (9-27-05 Suppl. Aff. of Eliana Almache.)

4.    Conclusion

The Court finds that TelCove has not demonstrated that Schneider's inconsistent testimony regarding his law degree constitutes a fraud on the Court under Herring or Perna.  TelCove has not shown that Schneider's failure to properly identify his educational background constitutes bad faith or egregious circumstances.  Moreover, the issue of the veracity of Schneider's assertion regarding his law school education while certainly a basis for impeachment, is not directly relevant to the material issues in this case.

## **CONCLUSION**

TelCove has failed to show that Asch and Archer & Greiner have committed a fraud upon the Court thus entitling TelCove to a dismissal of the complaint or an award of attorney's fees. Although the analysis <u>infra</u> broke down TelCove's allegations by topic, TelCove has not demonstrated that the totality of Schneider and Dosil's misstatements, possibly false statements, and otherwise inconsistent statements, reach — at least at this stage in the litigation — the level of "egregious circumstances" or "exceptional circumstances" comprising bad faith or a fraud upon the Court.[11]

Schneider has provided at least a reasonably plausible interpretation of his inconsistent statements regarding hosting pornography, his relationship with IQ Web, and his acquisition (or lack thereof) of "opt-in lists," and the issues concerning these topics will ultimately be resolved by a jury. Even if Schneider's testimony was false or perjurious concerning these issues, perjury alone does not constitute a fraud upon the Court.

---

[11] <u>See, e.g.</u>, <u>Nichols v. Klein Tools</u>, 949 F.2d 1047, 1048-49 (8th Cir. 1991) (finding fraud upon the court where plaintiff lied at depositions and in pleadings about using defendant's snap hook, as opposed to his own home-made hook, in products liability case); <u>Derzack v. County of Allegheny</u>, 173 F.R.D. 400, 417-18 (W.D. Pa. 1996) (concluding fraud upon the court where plaintiffs manufactured evidence to support claim and then attempted to cover up after deceit was discovered); <u>Perna</u>, 916 F.Supp. at 402 (finding that partner in law firm's conduct was extraordinary and in bad faith when he reviewed opposing counsel's documents while parties were taking lunch break during deposition).

Herring, 424 F.3d at 391.  Moreover, the Court finds that TelCove
has not shown that Schneider willfully testified falsely or that
his conduct was otherwise in bad faith.  Furthermore, TelCove's
allegations of Schneider's falsehoods about, inter alia, his
relationship with Dosil, his law school, and the timing of and
his actions in response to the Chawla Complaint, do not impact
the underlying merits of the litigation and, thus, cannot
constitute a fraud upon the Court.

The Court — although not finding that Asch and Archer &
Greiner committed a fraud upon the Court — finds that Dosil's
conduct thus far in an attempt to be "cute" or otherwise "less
than forthright" is unacceptable and will not be tolerated.
Dosil has provided conflicting statements and testimony about his
relationship to Schneider and Asch, and neither Asch nor Dosil
has asserted a reasonably truthful interpretation of his
conflicting testimony.  The Court will not permit Dosil to
provide false, confusing, or otherwise misleading testimony to
the jury in this case.  As such, the Court reminds the plaintiff
of the possible potential ramifications — described above — if
Dosil is called as a witness.

TelCove has also not shown, at least at this stage in the
litigation, that Schneider and Archer & Greiner's conduct in
filing motions and other papers in this case was objectively
unreasonable to warrant sanctions pursuant to Rule 11.  Moreover,
even if the Court were to find that Schneider provided incorrect

factual information in the verified complaint, in his affidavit in support of the TRO Motion, in his verification in response to the motion for sanctions, or in Asch's discovery responses, TelCove has not demonstrated that Schneider or Archer & Greiner submitted these documents frivolously or in bad faith.  However, because Rule 11 sanctions are "normally . . . determined at the end of litigation," the Court will deny without prejudice TelCove's motion to impose sanctions pursuant to Rule 11.[12]

The Court, for the reasons discussed <u>infra</u>, will (1) deny with prejudice the part of the motion seeking to impose sanctions, including dismissing the complaint and awarding attorney's fees, pursuant to the Court's inherent power, and (2) deny without prejudice the part of the motion seeking to impose sanctions under Rule 11.  The Court will issue an appropriate order.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

---

[12] <u>See</u> <u>Baker</u>, 158 F.3d at 523 (citation omitted).